UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN DION COCROFT, an individual, on behalf of himself, and on behalf of all persons similarly situated,<br><br>　　　　　　　　　　　　Plaintiff,<br><br>　v.<br><br>EQUIPMENTSHARE.COM INC.,<br><br>　　　　　　　　　　　　Defendant. | Case No. 24-cv-00645-BAS-AHG<br><br>**ORDER DENYING PLAINTIFF'S MOTION TO REMAND PROCEEDINGS TO STATE COURT**<br><br>**(ECF No. 11)** |

　　　　Defendant EquipmentShare.com Inc. ("EquipmentShare") removed this case from San Diego County Superior Court on April 4, 2024, asserting jurisdiction exists under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). (Notice of Removal, ECF No. 1.)  Plaintiff Kevin Dion Cocroft filed a Motion to Remand on May 2, 2024, arguing Defendant's Notice of Removal fails to show CAFA's amount in controversy requirement is satisfied. (Mot. to Remand, ECF No. 11.)  Defendant opposes (Opp'n, ECF No. 16), and Plaintiff replies (Reply, ECF No. 18).  The Court finds this Motion suitable for determination on the papers submitted and without oral argument.  *See* Fed. R. Civ. P. 78(b); Civ. L.R. 7.1(d)(1).  For the reasons set forth below, the Court **DENIES** Plaintiff's Motion to Remand.

## I.   BACKGROUND

Defendant is a construction equipment rental company that employed Cocroft as a non-exempt employee and paid him hourly from July to August 2023. (Compl. ¶¶ 2–3, ECF No. 1-4.) Plaintiff alleges Defendant denied him and other employees the benefits of the California Labor Code and the Industrial Welfare Commission ("IWC") Wage Orders. (*Id.* ¶ 8.) Furthermore, Plaintiff alleges Defendant failed to pay minimum and overtime wages, provide meal and rest periods, furnish final wages when due, maintain accurate itemized wage statements, and reimburse employees for required expenses.[1] (*Id.* ¶ 14.) Plaintiff asserts these claims on behalf of himself and "all persons who are or previously were employed by Defendant . . . and classified as non-exempt employees . . . at any time" from February 29, 2020, to the ending date determined by the Court. (*Id.* ¶ 4.)

## II.  LEGAL STANDARD

The court has an independent obligation to ensure jurisdiction is present. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (holding courts maintain an obligation to determine whether jurisdiction exists, "even in the absence of a challenge from any party"). "It is well established that 'lack of federal jurisdiction cannot be waived or be overcome by an agreement of the parties.'" *United Invs. Life Ins. Co. v. Waddell & Reed Inc.*, 360 F.3d 960, 966–67 (9th Cir. 2004) (quoting *Mitchell v. Maurer*, 293 U.S. 237, 244 (1934)). Thus, despite the parties filing a Joint Request to Stay (ECF No. 19) a decision on Plaintiff's Motion, the Court must determine whether jurisdiction exists before continuing with this lawsuit.

A case is removable only if it could have originally been filed in federal court. *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 163 (1997) ("As a general matter, defendants may remove to the appropriate federal district court 'any civil action brought in

---

[1] Plaintiff also brings a cause of action for unfair competition in violation of the California Business and Professions Code, but Defendant's Notice of Removal does not include this claim as part of the amount in controversy determination under CAFA. Cal. Bus. & Prof. Code §§ 17000–87. (Compl. ¶¶ 63–68.)

a State court of which the district courts of the United States have original jurisdiction.'" (quoting 28 U.S.C. § 1441(a))). Whether removal is warranted depends on the pleadings "as of the time the complaint is filed and removal is effected." *Strotek Corp. v. Air Transp. Ass'n of Am.*, 300 F.3d 1129, 1131 (9th Cir. 2002).

CAFA extends original jurisdiction as its "provisions should be read broadly, with a strong preference that interstate class actions should be heard in a federal court if properly removed by any defendant." *Jauregui v. Roadrunner Transp. Servs., Inc.*, 28 F.4th 989, 993 (9th Cir. 2022) (citation omitted) (quoting *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014)); *see also Ibarra v. Manheim Invs., Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015) ("Congress intended CAFA to be interpreted expansively."). Furthermore, CAFA expands "federal jurisdiction to state-law claims in class actions under relaxed diversity requirements." *Floyd v. Am. Honda Motor Co.*, 966 F.3d 1027, 1036 (9th Cir. 2020).

CAFA confers jurisdiction over class actions involving: (1) minimal diversity; (2) at least 100 putative members; and (3) over $5 million in controversy, inclusive of attorneys' fees but exclusive of costs and interest. 28 U.S.C. § 1332(d)(2), (5). Class members' claims may be aggregated to reach the amount in controversy requirement. *Ibarra*, 775 F.3d at 1195. Furthermore, the amount in controversy "encompasses all relief a court may grant on that complaint if the plaintiff is victorious." *Fritsch v. Swift Transp. Co. of Ariz., LLC*, 899 F.3d 785, 791 (9th Cir. 2018) (citation omitted) (quoting *Chavez v. JPMorgan Chase & Co.*, 888 F.3d 413, 414–15 (9th Cir. 2018)). Ultimately, "no antiremoval presumption attends cases invoking CAFA, which Congress enacted to facilitate adjudication of certain class actions in federal court." *Dart Cherokee*, 574 U.S. at 89. However, "the burden of establishing removal jurisdiction remains, as before, on the proponent of federal jurisdiction." *Abrego Abrego v. Dow Chem.*, 443 F.3d 676, 685 (9th Cir. 2006).

//
//

## III. ANALYSIS

At issue is whether Defendant shows CAFA's amount in controversy requirement is met.[2] The Court first reviews the short and plain statement requirement and Defendant's amount in controversy assessment. Next, the Court considers Plaintiff's attacks on Defendant's assessment, including Defendant's proposed violation rates and calculations.

### A. "Short and Plain" Statement Under 28 U.S.C. § 1446(a)

Plaintiff asserts Defendant's Notice of Removal fails to provide any evidence or testimony in support of Defendant's claims. (Mot. 1:12–14.) To remove a case to federal court, the defendant must file a notice of removal "containing a short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a). The defendant's notice of removal "need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee*, 574 U.S. at 89. If the defendant relies on assumptions to approximate the amount in controversy, they "cannot be pulled from thin air but need some reasonable ground underlying them." *Ibarra*, 775 F.3d at 1199; *see also id.* at 1197 ("[A] defendant cannot establish removal jurisdiction by mere speculation and conjecture, with unreasonable assumptions.").

Only after jurisdiction is sufficiently challenged is the removing party obligated to prove by a preponderance of the evidence that the jurisdictional amount in controversy is met. *See Rodriguez v. AT & T Mobility Servs.*, 728 F.3d 975, 981 (9th Cir. 2013); 28 U.S.C. § 1446(c)(2)(B). In other words, when the defendant's plausible estimate of the amount at stake is contested, "both sides submit proof and the court decides, by a preponderance of the evidence, whether the amount-in-controversy requirement has been satisfied." *Dart Cherokee*, 574 U.S. at 88; *see Jauregui*, 28 F.4th at 994. This framework, which Plaintiff acknowledges (Mot. 3:7–13), forecloses his argument that Defendant's Notice of Removal

---

[2] Minimal diversity exists under CAFA as the putative class includes California citizens, and Defendant is a Missouri corporation. 28 U.S.C. § 1332(d)(2)(A). Additionally, Defendant alleges the putative class is greater than 100 members, and Plaintiff's Opposition is limited to disputing the amount in controversy. *Id.* § 1332(d)(5)(B).

is deficient because it does not include evidence. Hence, when Defendant filed its Notice of Removal, Defendant was only required to plausibly allege the amount in controversy exceeds $5 million.

### B. Defendant's Calculation of the Amount in Controversy

Defendant estimates a total amount in controversy between $5,099,510.00 and $9,463,536.25. (Opp'n 1:19–20.) Thus, Defendant claims that even by more conservative calculations, the amount in controversy still exceeds $5 million. (*Id.* 1:17–18.)

To determine the amount in controversy, Defendant makes assumptions based upon Plaintiff's Complaint and a declaration from a third-party statistician, Levon Massmanian. (Massmanian Decl. ¶ 2, ECF No. 16-1.) Mr. Massmanian's Declaration provides an analysis of Defendant's timekeeping data, which allows for an approximation of the amount in controversy based upon the totals of 80,073 shifts worked; 79,047 eligible rest breaks over four hours; 78,165 eligible meal breaks over five hours; and 9,907 pay periods. (*Id.* ¶¶ 7–8.) Additionally, Mr. Massmanian's review of Defendant's timekeeping records reveals that "employees worked an average of 9.28 total shifts" per pay period, with an average shift length of 9.69 hours, for an average hourly rate of $30.15. (*Id.* ¶¶ 9–10.)

#### 1. Unpaid Meal Periods

Plaintiff alleges Defendant provides late and shortened meal breaks or denies first and second meal breaks altogether. (Compl. ¶¶ 15–16.) California Labor Code section 226.7, in combination with the applicable IWC Wage Order, requires employers to provide employees with a thirty-minute meal break for shifts over five hours and a second thirty-minute meal break for shifts over ten hours. Additionally, Plaintiff, even if provided a meal period, was not fully relieved of duty because employees were required to "maintain cordless communication devices in order to receive and respond to work-related communications during what was supposed to be their off-duty meal breaks." (*Id.* ¶ 16.)

Further, the Complaint states that due to a lack of "an immutable timekeeping system," Defendant unlawfully and unilaterally altered employees recorded time to avoid paying employees for all hours worked. (*Id.* ¶ 42.) Thus, Defendant was able to create the

appearance that full-length meal breaks were provided when they were not. (*Id.* ¶ 44.) Plaintiff also alleges Defendant would round employees' hours to avoid paying overtime compensation, which resulted in employees having performed work for more than five hours "without receiving an off-duty meal break." (*Id.* ¶ 47.) Hence, Plaintiff seeks "one additional hour of compensation at each employee's regular rate of pay for each workday that a meal period was not provided." (*Id.* ¶ 27.)

Defendant divides the potential missed meal periods into two categories: those that were facially missed and those that may have been fictitiously added or altered. First, to calculate the penalties for facially missed meal periods, Defendant—through Mr. Massmanian—analyzes shift data from Defendant's timekeeping records. (Decl. ¶ 13.) Defendant identifies the number of shifts over five hours and thus eligible for a first meal break. (*Id.*) Then, Defendant discerns meal breaks that are less than thirty minutes, taken after the fifth hour of work, or fully denied. (*Id.*) Additionally, Defendant identifies the number of shifts that were over ten hours and "did not have a second recorded meal break in the timekeeping records." (*Id.* ¶ 14.) After factoring in "each employee's hourly rate as indicated in the payroll data," Defendant concludes the amount in controversy for this category is $1,605,596.00. (Opp'n 8:12–14.)

Second, to calculate the penalties for meal periods that were fictitiously recorded, which Defendant does not possess the necessary data to be able to distinguish from legitimately recorded meal breaks, Mr. Massmanian identifies "meal break eligible shifts with recorded first meal breaks that were exactly thirty minutes in duration." (Decl. ¶ 15.) As a result, shifts that may have been captured within the facially missed meal period category are not double counted. (*Id.*) Accordingly, Defendant provides 25%, 50%, 75%, and 100% violation rates for the identified meal breaks and concludes the amount in controversy is between $156,263.00 and $625,050.00 for this category. (*Id.* ¶ 16.)

  **2.**  **Unpaid Rest Periods**

Plaintiff alleges he worked through his legally required rest periods during shifts longer than four hours as a result of Defendant's rigorous work schedules and inadequate

staffing.[3] (Compl. ¶ 16.) Similar to Plaintiff's meal break allegations, Plaintiff's rest breaks were also affected by Defendant's requirement that employees "respond to work-related communications" during breaks (*id.*), as well as Defendant's timekeeping manipulation violations (*id.* ¶ 42) and unlawful rounding practices (*id.* ¶ 46). Hence, in addition to an hour of pay for meal break violations, Plaintiff seeks "one additional hour of compensation at each employee's regular rate of pay for each workday that [a] rest period was not provided." (*Id.* ¶ 29.)

To calculate unprovided rest period penalties, Mr. Massmanian identifies the number of shifts in excess of four hours, assumes varying violation rates of 25%, 50%, 75%, and 100%, and then multiplies the resulting number by the average hourly rate of each employee. (Decl. ¶ 18.) As a result, Defendant concludes the amount in controversy for Plaintiff's rest period claim is between $668,726.00 and $2,674,905.00. (Opp'n 10:1–2.)

### 3. Unpaid Minimum Wage and Overtime Compensation

Plaintiff alleges Defendant requires employees to work while off the clock, which results in unpaid minimum wage and overtime compensation because employees "typically worked over forty hours in a workweek and more than eight hours per day." (Compl. ¶ 30.) Specifically, employees are required "to perform pre-shift or post-shift work, including but not limited to, time spent training, onboarding, and attending orientations." (*Id.* ¶ 25.) This claim is also derivative of meal and rest break violations, as Plaintiff alleges employees were not accurately compensated for overtime and double time resulting from shortened or missed meal and rest breaks.[4] (*Id.* ¶ 10.) Furthermore, Plaintiff applies Defendant's timekeeping violations and unlawful rounding practices to increase the amount of time employees were not paid for all hours worked. (*Id.* ¶¶ 42–47.)

---

[3] "Further, for the same reasons, these employees were denied their first periods of at least ten minutes for some shifts worked of at least two to four hours, a first and second rest period of at least ten minutes for some shifts worked between six and eight hours, and a first, second, and third rest period of at least ten minutes for some shifts worked of ten hours or more." (Compl. ¶ 7.)

[4] Plaintiff also alleges a systematic underpayment of sick time and incentive wages based on performance as part of a non-discretionary bonus program, but Defendant does not seemingly include these claims in its amount in controversy calculation. (Compl. ¶¶ 35–36.)

Defendant's calculation of the amount in controversy addresses the "inherent nature of the lack of information regarding whether putative class members performed work during unrecorded hours" by basing the potential daily time owed on an assumption of five, ten, fifteen, or twenty minutes of unpaid time per shift. (Opp'n 10:9–16 (citing Decl. ¶ 20).) Subsequently, Mr. Massmanian multiplies the result of each assumption by the California state minimum wage for each relevant year or the applicable overtime factor for eligible shifts. (Decl. ¶ 21.) Based upon these four assumptions of unpaid time per shift, Defendant calculates the damages for this claim range between $212,244.00 and $854,509.00. (Opp'n 11:3.)

### 4. Noncompliant Expense Reimbursements

Plaintiff alleges that, over the course of his employment, Defendant required employees to "use their personal cell phones and home internet as a result of and in furtherance of their job duties." (Compl. ¶ 19.) Employers must indemnify employees "for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of [the employee's] duties . . . ." Cal. Lab. Code § 2802(a). As a result, Plaintiff claims reimbursement for the costs employees incurred as well as their losses related to the use of their personal cell phones and home internet. (Compl. ¶ 19.)

In calculating the amount in controversy for this claim, Defendant breaks down the employees' expenditures by cell phone and home internet. First, to calculate cell phone expenditures and losses, Mr. Massmanian analyzes timekeeping data to gather the number of applicable bi-weekly pay periods and then references the Bureau of Labor Statistics Consumer Expenditure Survey data from 2022 to identify the average annual expenditure for cellular phone services. (Decl. ¶ 26.) Defendant then concludes employees' bi-weekly cellular expenses are $49.40 and applies this at a 50% and 100% usage rate. (Opp'n 14:24–26 (citing Decl. ¶ 26).) Based off these two assumptions, Defendant's amount in controversy for cellular phone services ranges from a low of $244,703.00 to a high of $489,406.00. (Opp'n 15:1.) Second, to calculate home internet expenditures and losses, Mr. Massmanian uses the same bi-weekly pay period data and the same survey data to

conclude employees' bi-weekly home internet expenses are $26.10. (Decl. ¶ 27.) Again applying a 50% and 100% usage rate, Defendant's amount in controversy for home internet expenses ranges from a low of $129,286.00 to a high of $258,573.00. (Opp'n 15:11–15.)

### 5. Noncompliant Wage Statements

Plaintiff alleges Defendant violated California Labor Code section 226 by not providing employees with accurate itemized wage statements. (Compl. ¶ 22.) Defendant's wage statements purportedly fail to show all deductions, including "the total hours worked and all applicable hourly rates in effect during the pay period and the corresponding amount of time worked at each hourly rate, correct rates of pay for penalty payments, or missed meal and rest periods." (*Id.* ¶ 21.) As a result, Plaintiff's noncompliant wage statement claim is derivative of his meal and rest period claims as well as his failure to pay minimum and overtime wages claims. (*Id.*) Plaintiff acknowledges the damages suffered by employees who may have received inaccurate wage statements are difficult to estimate. (*Id.* ¶ 124.) Hence, Plaintiff seeks $50.00 in liquidated damages for the initial pay period violation and $100.00 for each violation in a subsequent pay period.[5] (*Id.*)

Mr. Massmanian reviews Defendant's timekeeping records to identify the exact number of applicable pay periods during the statutory period (Decl. ¶ 24) and uses the liquidated damages Plaintiff seeks in the Complaint (Compl. ¶ 124). Defendant then estimates one violation per pay period to calculate an amount in controversy of $406,050.00 for Plaintiff's claims of noncompliant wage statements. (Opp'n 18:6.)

### 6. Noncompliant Payment of Wages When Due

Plaintiff also alleges the wage statements Defendant provides to terminated employees do not comply with the requirements of the California Labor Code because Defendant has not tendered payment of wages to the employees who missed meal and rest periods and who were not compensated at the minimum wage and for overtime hours

---

[5] Plaintiff seeks no more than $4,000.00 for himself and each member of the California Class (Compl. ¶ 124), and Defendant does not calculate more than this amount for each individual in its amount in controversy calculation (Decl. ¶ 24 n.35). *See* Cal. Lab. Code § 226(e)(1).

worked. Cal. Lab. Code §§ 200–02. (Compl. ¶¶ 126–30.) As a result, Plaintiff's claim for noncompliant payment of wages when due is derivative. Plaintiff "demands up to thirty days of pay as penalty" pursuant to California Labor Code section 203. (*Id.* ¶¶ 130–32.)

To calculate the amount in controversy, Mr. Massmanian identifies the employees who are potentially owed waiting time penalties from Defendant's timekeeping records. (Decl. ¶ 23.) Mr. Massmanian then uses the "actual final hourly rate of each former employee at termination" (*id.*) because "any wages of an employee who is discharged or who quits . . . shall continue as a penalty from the due date thereof at the same rate . . . ." Cal. Lab. Code § 203. Next, Mr. Massmanian multiplies the employees' average daily hours worked by "the minimum thirty days or number of days from the termination date to the Class Action Filing date, whichever is less." (Decl. ¶ 22 (citing Cal. Lab. Code § 203).) Defendant totals an estimate of $656,740.00 for Plaintiff's waiting time penalties claim. (Opp'n 14:9.)

### 7. Attorneys' Fees

Plaintiff's Complaint seeks "interest, statutory and civil penalties, attorney's fees, costs, and expenses." (Compl. ¶ 51.) Given the amount in controversy under CAFA is "inclusive of attorney's fees but exclusive of costs and interest," Defendant accordingly limits its calculation. 28 U.S.C. § 1332(d)(2), (5). Defendant calculates attorneys' fees as 25% of the damages "a plaintiff may be awarded upon successfully pursuing the underlying claims." (Opp'n 15:18.) Based upon Defendant's use of a 25% rate to estimate attorneys' fees, the amount in controversy for this item ranges as it is applied to the lower total bound ($4,079,608.00) and the upper total bound ($7,570,829.00) of Defendant's calculation of all Plaintiff's other claims. (*Id.* 17:8–9.) Defendant's assessment of the potential attorneys' fees thus ranges between $1,019,902.00 and $1,892,707.25.00. (*Id.*)

### C. Whether the Amount in Controversy Is Met

#### 1. General Sufficiency of Evidence

Plaintiff challenges the reasonableness of Defendant's amount in controversy assumptions. (Reply 1:2–8.) One way to challenge the defendant's jurisdictional

allegations is to make a "factual attack." *Harris v. KM Indus., Inc.*, 980 F.3d 694, 700 (9th Cir. 2020). A factual attack includes "making a reasoned argument as to why any assumptions on which [the allegations] are based are not supported by evidence." *Id.*; *see also Ibarra*, 775 F.3d at 1199 (noting it may be sufficient to contest an assumption without asserting alternative evidence). There is no per se rule that requires the plaintiff to produce any evidence or alternative assumptions. *See Ibarra* 775 F.3d at 1199. Yet, if the defendant has offered reasonable assumptions, the plaintiff may find it useful to contest an assumption with alternative evidence, such as an affidavit from the plaintiff asserting how often he experienced the violation, to bolster the reasonableness of his own challenge. *Id.*; *see also Harris*, 980 F.3d at 700.

Similar to the defendant in *Harris*, Defendant treats Plaintiff's Motion to Remand as a factual challenge. 980 F.3d at 700. By submitting proof in the form of Mr. Massmanian's Declaration, Defendant provides further evidence in support of its assumptions. *Id.* Once Plaintiff has contested the reasonableness of Defendant's assumptions, Defendant "need not make [Plaintiff's] case for [him] or prove the amount in controversy." *See id.* at 701. However, Defendant now has "the burden of proving by a preponderance of the evidence that its assumptions were reasonable." *Id.* The Court applies this framework below when addressing the merits of Plaintiff's attacks on Mr. Massmanian's Declaration, Defendant's proposed violation rates, and Defendant's assessment of the potential attorneys' fees.

### 2. Plaintiff's Challenges to Defendant's Showing

Plaintiff asserts Defendant fails to produce reliable evidence from which Defendant has plausibly drawn its assumptions. (Reply 2:1–6.) Plaintiff argues Mr. Massmanian's Declaration relies on unreasonable assumptions because "despite conducting a full analysis," Defendant "has not produced any additional evidence" to support Defendant's reasoning when the timekeeping records are in Defendant's own possession. (*Id.* 6:3–12.) However, "a party's access to additional information does not necessarily render the assumptions made by that party unreasonable." *Shachno v. Marriott Int'l, Inc.*, No. 22-CV-1215-TWR (JLB), 2023 WL 316367, at *8 (S.D. Cal. Jan. 19, 2023).

> As is inescapable at this early stage of the litigation, the removing party must be able to rely "on a chain of reasoning that includes assumptions to satisfy its burden to prove by a preponderance of the evidence that the amount in controversy exceeds $5 million," as long as the reasoning and underlying assumptions are reasonable.

*Jauregui*, 28 F.4th at 993 (quoting *LaCross v. Knight Transp. Inc.*, 775 F.3d 1200, 1201 (9th Cir. 2015)). Defendant, in employing Mr. Massmanian, has analyzed its timekeeping records and the appropriate employee payroll information to inform its calculations. (Decl. ¶¶ 3–6.)

Moreover, Defendant has made reasonable assumptions based upon Mr. Massmanian's analysis of Defendant's timekeeping records and the language included in Plaintiff's Complaint. *See Dart Cherokee*, 574 U.S. at 89; *Arias v. Residence Inn by Marriott*, 936 F.3d 920, 925 (9th Cir. 2019) ("An assumption may be reasonable if it is founded on the allegations of the complaint."). Whether the alleged violations occur from time to time, as a matter of pattern and practice, or uniformly, as alleged in the complaint, has a significant impact on the amount in controversy calculation. *See Arias*, 936 F.3d at 925–26 (distinguishing between the varying language a plaintiff may include in the complaint and the direct impact it has on the reasonableness of the assumed violation rate). This frequency informs the court's adoption of a violation rate expressed as a percentage when calculating the amount in controversy. *See Powell v. USI Ins. Serv., LLC*, No. 2:23-cv-04129-ODW (BFMx), 2023 WL 6276578, at *4–5 (C.D. Cal. Sept. 25, 2023) (distinguishing between allegations of a pattern and practice, which could not reasonably support a 100% violation rate, and allegations resulting from a uniform policy, which could plausibly support a 100% violation rate).

"Although the plaintiff is the master of their complaint, they cannot avoid federal jurisdiction by purposefully opaque pleading." *Shachno*, 2023 WL 316367, at *12 (citation omitted). Here, Plaintiff's Complaint alternates between alleging Defendant's violations occur from "time to time" and are the result of "uniform policies and practices." (*See* Compl. ¶¶ 14–49.) Generally, Plaintiff describes Defendant's overall conduct as being

attributable to "a matter of company policy, practice, and procedure," which was a scheme perpetuated "intentionally, knowingly, and systematically" in a "uniform" manner. (*Id.* ¶ 14.) Subsequently, Plaintiff periodically uses the modifying language of "regularly" and "from time to time" throughout the Complaint to describe his claims. (*See id.* ¶¶ 14–49.) Furthermore, Plaintiff states that violations occur both "from time to time" and as a matter of a "uniform policy and practice" within the same allegations for several claims. (*E.g.*, *id.* ¶¶ 15–16.) Thus, the Court evaluates Defendant's calculations based upon the use of Defendant's timekeeping records and the language Plaintiff offers in the Complaint.

The Court extends this analysis to the several challenges Plaintiff brings beyond his attack on the reliability of the evidence. First, Plaintiff attacks Defendant's violation rate assumptions for fictitious meal periods, missed rest periods, unpaid minimum and overtime wages, wage statement penalties, and waiting time penalties. (*See* Reply 1.) Second, Plaintiff contests Defendant's calculations for the facially missed meal periods and for the failure to reimburse employees' expenditures. (*Id.*)

### i.  Violation Rate

#### a.  Fictitious Meal Periods and Missed Rest Periods

Defendant calculates the amount in controversy for fictitious meal breaks and missed rest periods using the applicable timekeeping data and then applies violation rates of 25%, 50%, 75%, and 100% for each claim. (*See* Opp'n 9.) Thus, the Court will assess the violation rates used for both claims simultaneously as Plaintiff's Complaint states Defendant's timekeeping manipulation affects both meal and rest breaks as well. (Compl. ¶ 42.) In claiming that Defendant's timekeeping system was not immutable, Plaintiff uses the language of "from time to time" while also stating that Defendant's practice of maintaining an inoperable timekeeping system was a direct result of Defendant's "uniform policy and practice." (*Id.* ¶¶ 42, 45.) Additionally, while Plaintiff's Complaint alleges violations occur "from time to time," the same paragraph simultaneously alleges they occur on "many days" and "regularly" as a result of Defendant's "uniform policy and practice not to pay Plaintiff." (*Id.* ¶ 15.)

District courts have found violation rates of 25% to 60% to be reasonably assumed as a matter of law based on "pattern and practice or policy and practice allegation[s]." *Avila v. Rue21, Inc.*, 432 F. Supp. 3d 1175, 1189 (E.D. Cal. 2020) (citation omitted); *Elizarraz v. United Rentals, Inc.*, No. 2:18-CV-09533-ODW (JC), 2019 WL 1553664, at *3–4 (C.D. Cal. Apr. 9, 2019) (using a 50% violation rate for the meal period claim and a 30% violation rate for the rest period claim); *Bryant v. NCR Corp.*, 284 F. Supp. 3d 1147, 1151 (S.D. Cal. 2018) (using a 60% violation rate for the meal period claim and a 30% violation rate for the rest period claim); *Alvarez v. Off. Depot, Inc.*, No. CV 17–7220 PSG (AFMx), 2017 WL 5952181, at *3 (C.D. Cal. Nov. 30, 2017) (using a 60% violation rate for both the meal and rest period claims).

In contrast, the language in Plaintiff's Complaint extends past "pattern and practice" allegations, which give rise to the 25% to 60% range, to allegations of a "uniform policy and practice" and an "inoperable timekeeping system," which give rise to a 100% violation rate.[6] (*See* Compl. ¶¶ 14–49.) Because the amount in controversy is determined by the complaint, Defendant relies on this language, and the Court finds that a 75% violation rate is a plausible assumption. *See Fritsch*, 899 F.3d at 792; *Ibarra*, 775 F.3d at 1199. While the Complaint's limiting language of "from time to time" casts doubt upon Defendant's reasonable use of a 100% violation rate, the simultaneous and conflicting use of "uniform policy and practice" provides a plausible basis for Defendant to select a 75% violation rate,

---

[6] *See Alvarez*, 2017 WL 5952181, at *3 ("The Court . . . agrees with Defendant that it could utilize an alleged 100% violation rate in calculating the amount in controversy because Plaintiff's complaint alleges a uniform practice of meal and rest period violations." (citation omitted)); *Amaya v. Consol. Container Co., LP*, No. 2:15-cv-03369-SVW-PLA, 2015 WL 4574909, at *2 (C.D. Cal. July 28, 2015) ("[C]ourts have generally found the amount in controversy satisfied where a defendant assumes a 100% violation rate based on allegations of a uniform illegal practice (or other similar language) and where the plaintiff offers no evidence rebutting this violation rate." (citation omitted)); *Powell*, 2023 WL 6276578, at *5 ("If a complaint alleges 'uniform' practice, the defendant's amount in controversy calculus assumes a 100% violation rate, and no competent evidence in rebuttal to the defendant's evidence is shown, then 'courts have found the defendant's assumption to be reasonable.'" (quoting *Dobbs v. Wood Grp. PSN, Inc.*, 201 F. Supp. 3d 1184, 1188 (E.D. Cal. 2016)); *see generally Vasquez v. Randstad US, L.P.*, No. 17-cv-04342-EMC, 2018 WL 327451, at *5 (N.D. Cal. Jan. 9, 2018) (finding the language of "consistently" in the complaint could produce a reasonable 100% violation rate).

which is outside of the established range typically used for events that may be assumed to occur less often. (*See* Compl. ¶¶ 14–49.) As a result, the Court finds persuasive Defendant's calculation that produces a total of $468,788.00 for fictitious meal periods and $2,006,178.00 for missed rest periods.

### b. Unpaid Minimum Wage and Overtime Compensation

Plaintiff challenges Defendant's use of a 100% violation rate in applying the possible assumptions of five, ten, fifteen, and twenty minutes of potential unpaid time per shift to Defendant's timekeeping data calculations. (Opp'n 10:13–15.) Plaintiff argues a 100% violation rate is not reasonable given his language of "from time to time" within the Complaint. (Reply 3:13–20.) However, in making this argument, Plaintiff fails to acknowledge his use of "uniform policy and practice" (Compl. ¶¶ 32, 83–84, 98), "systematic underpayment" (*id.* ¶ 36), and "perpetration of a systematic scheme" (*id.* ¶¶ 89, 105), which occur more frequently throughout these claims of Plaintiff's Complaint. Additionally, Plaintiff's critique overlooks that the Ninth Circuit has approved of assessing unpaid minimum wage and overtime pay on a weekly basis. *See Jauregui*, 28 F.4th at 994 (holding the defendant's assumption that one hour of work a week went unpaid was reasonable); *see also Cavada v. Inter-Cont'l Hotel Grp., Inc.*, No. 19cv1675-GPC(BLM), 2019 WL 5677846, at *5 (S.D. Cal. Nov. 1, 2019) (determining it was reasonable for the defendant to find two hours of unpaid overtime per week based on the complaint's policy and practice language). Hence, rather than examining Defendant's violation rate per shift, the Court evaluates the violation frequency per week. Based on the language in Plaintiff's Complaint, Defendant's assumption of 1.25 hours (fifteen minutes per shift) of potential unpaid time owed per week reasonably falls between the previously used range of one to two hours per week.

Furthermore, Mr. Massmanian states employees work an average of 9.28 total shifts per pay period with an average shift length of 9.69 hours. (Decl. ¶¶ 9–10.) Plaintiff supports this timekeeping data by likewise alleging in his Complaint that Defendant's policies and practices deprive employees of overtime pay because employees typically

work over forty hours in a workweek and more than eight hours per day. (Compl. ¶ 30.) Thus, employees typically work about 4.96 hours of overtime per week, and Defendant's assumption of 1.25 hours per week (fifteen minutes per shift) would render about a 25% weekly violation rate. The Court finds this assumption reasonable, and Plaintiff does not submit any evidence to show how often Plaintiff himself was not properly compensated to cast doubt upon the reasonableness of Defendant's assumption. *See Avila*, 2020 WL 5677846, at *23 ("Plaintiff does not even submit her own declaration stating that she experienced less frequent rates of violation than those asserted by Defendants.").

Plaintiff also argues that "time spent training, onboarding, and attending orientations" are examples of one-time events. (Reply 3:21–23.) Yet, this assertion directly contradicts Plaintiff's language in the Complaint, which alleges Defendant maintained a "uniform pattern of unlawful wage and hour practices, [which] manifested, without limitation, applicable to the California Class as a whole, as a result of implementing a uniform policy and practice." (Compl. ¶ 98.) This language creates a plausible ground for Defendant's assumption that events such as trainings and pre-shift and post-shift work may occur more than once throughout the entirety of an employee's employment. (*Id.* ¶ 25.) Hence, Defendant's assumed violation rate of 1.25 hours per week (fifteen minutes of unpaid time per shift) is plausible based upon the language in the Complaint. This claim results in $639,502.00 in potential damages.

### c.  Wage Statement and Waiting Time Penalties

Defendant estimates one violation per pay period for Plaintiff's wage statement penalty claims, and that every employee who has been terminated is owed waiting time penalties. (*See generally* Opp'n 11–14.) This assumes a 100% violation rate for both claims. The Court finds Defendant's violation rate plausible based upon the allegations in the Complaint as well as reasonable provided these claims are derivative of Plaintiff's other claims. (*Id.* 11:11–12.) Because the Court has found 25% to 75% violation rates for Plaintiff's claims for fictitious meals, rest breaks, and unpaid minimum and overtime wages, one violation per pay period is reasonable. *See Cavada*, 2019 WL 5677846, at *8–

9 (finding that, based upon one missed meal and rest period, defendant's 100% violation rate was reasonable for wage statement and waiting time penalties); *Brumbach v. Hyatt Corp.*, No. 20-cv-2231-WQH-KSC, 2021 WL 926692, at *9 (S.D. Cal. Mar. 11, 2021) (concluding that where a plaintiff alleges a "consistent and uniform policy," it is a reasonable assumption that every single employee who separated from employment suffered unpaid wages). In addition, because Plaintiff seeks the maximum statutory penalty (Compl. ¶ 40), "Defendant need not produce evidence, and it is reasonable to assume . . . that Plaintiff could obtain [a] statutory penalty of maximum 30 days." *See Avila*, 432 F. Supp. 3d at 1188 (emphasis omitted). Thus, Defendant's 100% violation rate is reasonable as it is derivatively based upon Plaintiff's other claims and totals to $406,050.00 in wage statement penalties and $656,740.00 in waiting time penalties. (*See* Opp'n 18.)

### ii.  Calculations

#### a.  Facially Missed Meal Periods

Mr. Massmanian utilizes Defendant's timekeeping records and the appropriate shift data to calculate facially missed meal periods, but Plaintiff argues Defendant has double counted the event that an employee suffered a first meal break violation and a second meal break violation in the same day. (*See generally* Reply 6–7.) In doing so, Defendant has allowed for the possibility that an employee would be owed two meal premiums in a single workday when California Labor Code section 226.7 only allows for a maximum of one meal period premium per workday, regardless of how many meal periods were non-compliant. *United Parcel Serv. Wage & Hour Cases*, 196 Cal. App. 4th 57, 69 (2011) (construing "the statute as permitting up to two premium payments per workday—one for failure to provide one or more meal periods, and another for failure to provide one or more rest periods"). Thus, based on Mr. Massmanian's Declaration, Defendant has potentially double counted these facially missed meal periods. (Opp'n 8:9–13 (citing Decl. ¶ 14).)

While Plaintiff shows the second meal period shifts may not reasonably be included in Defendant's calculation of the amount in controversy, this does not affect the first meal

eligible shifts. As the Court is not in the position to redo Defendant's calculations, the Court has removed the second meal eligible shifts from Defendant's calculations and left the remaining first meal shifts. *See Jauregui*, 28 F.4th at 994 (stating that reducing the value may be more appropriate than striking out a claim in its entirety). First meal shifts represent 47.95% of Defendant's total shift data used in its calculation, and 47.95% of Defendant's total amount in controversy calculation for facially missed meal periods is $769,883.28.

### b.     Failure to Reimburse

Plaintiff argues both that Defendant's calculations are inaccurate and that the assumed violation rates are unreasonable for Defendant's failure to reimburse employees for their personal cell phones and home internet. (Reply 8:14–23.) Yet, the Court finds Defendant reasonably uses the Bureau of Labor Statistics Consumer Expenditure Survey data. (Decl. ¶ 26.) *E.g.*, *Castro v. ABM Indus. Inc.*, No. 14-cv-05359-YGR, 2015 WL 1520666, at *4 (N.D. Cal. April 2, 2015) (accepting the use of this data as useful and reasonable). Defendant assumes two possible violation rates of 50% and 100% for its failure to reimburse employees (Decl. ¶ 26) "as a matter of corporate policy, practice, and procedure, intentionally, knowingly, and systematically . . ." (Compl. ¶ 18).

Again, Plaintiff uses the language of "time to time" and "uniform policy, practice and procedure" to describe this claim. (*Id.* ¶ 118.) Thus, while Defendant's use of the survey data is reasonable, Plaintiff's limiting language of "time to time" precludes a 100% violation rate. (*Id.*) Courts have typically found $20 to $30 a month plausible. *See Cavada*, 2019 WL 5677846, at *7 (finding $20 per employee per month reasonable); *Shachno*, 2023 WL 316367, at *11 (accepting $20 as plausible given other courts have accepted $25); *Castro v. ABM Indus., Inc.*, No. 17-cv-3026-YGR, 2017 WL 4682816, at *3 (N.D. Cal. Oct. 19, 2017) (accepting $27.14 as reasonable). Although Defendant's calculations result in an estimate outside of this typical range, Defendant provides plausible evidence to support its calculations, and the Court applies a conservative 30% violation rate. *See Powell*, 2023 WL 6276578, at *4 (determining the court would apply a 30%

violation rate to the defendant's $30 estimate despite receiving no evidence to support the assumption because the plaintiff failed to provide an alternative one). This results in $146,821.80 in cell phone expenditures and $77,571.90 in home internet expenses.

### iii. Attorneys' Fees

Plaintiff argues Defendant's attorneys' fee calculation is flawed and inappropriate. (Mot. 10:3–13:7.) As mentioned above, Defendant applies a 25% estimate of the total potential damages to determine the value of any attorneys' fees Plaintiff may be awarded upon successfully pursuing his claims. (Opp'n 15:17–18.) Courts have recognized this 25% benchmark does not automatically apply in all cases. *See Arias*, 936 F.3d at 928; *Avila*, 432 F. Supp. 3d at 1192. Thus, "the defendant must prove the amount of attorneys' fees at stake by a preponderance of the evidence; [the court] may not relieve the defendant of its evidentiary burden by adopting a per se rule for one element of the amount at stake in the underlying litigation." *Fritsch*, 899 F.3d at 796.

Here, Defendant has met this evidentiary burden by identifying several other similar cases in which Plaintiff's lawyers have sought and received a 33% fee award. (Opp'n 16:15–23.) *See Shachno*, 2023 WL 316367, at *14 (finding "Defendant's use of a 25% attorneys' fee is reasonable and appropriate" to meet the evidentiary burden where Defendant identifies several similar cases "in which Plaintiff's counsel sought and received a 33% fee award). This Court accepts Defendant's use of the 25% benchmark, which totals to $1,292,883.75 in potential attorneys' fees. This produces a total amount in controversy of $6,464,418.73.

//
//
//
//
//
//
//

| Cause of Action | Amount in Controversy |
|---|---|
| Failure to Provide Required Meal Periods | $1,238,671.28 |
| Failure to Provide Required Rest Periods | $2,006,178.00 |
| Unpaid Minimum and Overtime Wages | $639,502.00 |
| Failure to Provide Accurate Itemized Statement Penalties | $406,050.00 |
| Failure to Pay Wages When Due Penalties | $656,740.00 |
| Failure to Reimburse Employees for Required Expenses | $224,393.70 |
| **Total** | **$5,171,534.98** |
| Attorneys' Fees (25% Benchmark) | $1,292,883.74 |
| **Total with Attorneys' Fees** | **$6,464,418.72** |

\* \* \*

Overall, Defendant persuasively shows the amount in controversy surpasses the $5,000,000 required by CAFA. Because Defendant establishes subject matter jurisdiction by a preponderance of the evidence pursuant to CAFA, Plaintiff's Motion to Remand is denied.

## IV.   CONCLUSION

For the reasons set forth above, the Court finds that it has subject matter jurisdiction over this action pursuant to CAFA. Accordingly, the Court **DENIES** Plaintiff's Motion to Remand (ECF No. 11) and thus, **DENIES** the parties' Joint Request to Stay the Decision on the Motion (ECF No. 19).

IT IS SO ORDERED.

DATED: August 19, 2024

Hon. Cynthia Bashant
United States District Judge